No. 25-1399

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

NORTH CAROLINA DEMOCRATIC PARTY,

*Plaintiff-Appellant*,

*v.*

NORTH CAROLINA STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as Secretary of the North Carolina State Board of Elections; and STACY EGGERS IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of North Carolina,
Nos. 5:24-cv-699-M, 5:24-cv-731-M (lead case) (Myers, C.J.)

## NORTH CAROLINA DEMOCRATIC PARTY'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL
## (RELIEF REQUESTED BY APRIL 23, 2025)

SHANA L. FULTON
WILLIAM A. ROBERTSON
JAMES W. WHALEN
BROOKS, PIERCE, MCLENDON
    HUMPHREY & LEONARD, LLP
150 Fayetteville Street, Suite 1700
Raleigh, N.C. 27601
(919) 839-0300


April 17, 2025

SETH P. WAXMAN
DANIEL S. VOLCHOK
CHRISTOPHER E. BABBITT
JANE E. KESSNER
NITISHA BARONIA
ANN E. HIMES
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT ........................................................................................................2

      A.    State-Court Proceedings ...................................................2

      B.    NCDP's Lawsuit...............................................................4

      C.    The NCSBE's Ongoing Process......................................6

JURISDICTION....................................................................................................7

LEGAL STANDARD ...........................................................................................7

ARGUMENT .......................................................................................................8

I.     NCDP Will Likely Succeed On Appeal .......................................8

      A.    NCDP Is Likely To Succeed On Its Equal-Protection Claim ................................................................................8

      B.    NCDP Is Likely To Succeed On Its Due Process Claims..................10

II.    The Remaining Factors Favor An Injunction ..............................18

      A.    NCDP Will Be Irreparably Harmed Without An Injunction......................................................................18

      B.    The Equities And Public Interest Favor An Injunction......................20

CONCLUSION ..................................................................................22

## LOCAL RULE 27(a) STATEMENT

Defendant North Carolina State Board of Elections (NCSBE or Board) consents to the requested relief and intends to file a response.[*]

_____

[*] Judge Jefferson Griffin moved to intervene in the district court, Dkt.5:24-cv-699, ECF 15, but that motion was never granted, so he is not a party to this appeal.

**INTRODUCTION**

North Carolina Supreme Court Justice Allison Riggs won re-election five months ago, a victory confirmed through multiple recounts. Her opponent, North Carolina Court of Appeals Judge Jefferson Griffin, has litigated ever since in an effort to overturn the will of the people. He demands, on state-law grounds, that North Carolina alter the rules *after* the election in order to discard the votes of thousands of registered military servicepeople and other overseas citizens who indisputably followed the rules in place *during* (and before) the election. Such after-the-fact mass disenfranchisement would brazenly violate federal law and is being challenged in multiple cases in the Eastern District of North Carolina. Although that court has ordered state officials not to certify the election until it can adjudicate the alleged violations of federal law, it has also ordered state officials to identify votes to be discarded and require potentially thousands of voters to participate in a post-election "cure" process ordered by the North Carolina Supreme Court.

An injunction pending appeal of that order is warranted. *First*, plaintiff North Carolina Democratic Party (NCDP) will likely succeed on its claims that the First and Fourteenth Amendments prohibit subjecting select classes of voters (those strategically targeted by Griffin) to the post-election cure process authorized by state courts and/or discarding their votes. *Second*, without an injunction, NCDP will be irreparably harmed: Its members will be subjected to an unduly burdensome and

discriminatory "cure" process, and risk having their votes discarded—several months after the election; and NCDP itself will have to divert its limited resources to an unlawful and ill-defined "cure" effort, the scope and terms of which Griffin continues to litigate in state court. *Third*, NCSBE would not suffer any cognizable harm from a temporary injunction while the federal issues are resolved. *Fourth*, the public has a strong interest in ensuring that elections are fair and honest, which means not changing the rules after the fact.

The Court should enjoin the NCSBE pending this appeal from sending notices that trigger the 30-day cure window or discarding any votes.[1]

## STATEMENT

### A.    State-Court Proceedings

A state-wide canvass and several recounts confirmed that Justice Riggs won re-election as associate justice of the North Carolina Supreme Court, defeating Griffin. *See Griffin v. NCSBE*, 2025 WL 1021724, at *1 (N.C. Ct. App. Apr. 4, 2025). Dissatisfied, Griffin filed multiple election protests (the "Protests") claiming that the ballots of thousands of voters should not be counted—including (1) nearly 300 ballots "cast by overseas citizens who have not resided in North Carolina but whose parents or legal guardians were eligible North Carolina voters before leaving

---

[1] NCDP does not seek to enjoin NCSBE from taking preparatory steps it believes necessary, only from taking actions that trigger the 30-day "cure" window.

the United States," and (2) approximately 1,400 ballots cast in Guilford County "by military or overseas citizens under Article 21A of Chapter 163, when those ballots were not accompanied by a photocopy of a photo ID or ID Exception Form." *See* Dkt.5:24-cv-699 (E.D.N.C.), ECF 35-1 at 2. After the protest deadline had passed, he amended his protests to target a total of nearly 5,500 military or overseas voters. *See id.*, ECF 37-4 (Lawson Decl.) ¶10.

Voters targeted by the first category (whom Griffin labels "never residents") had the right to vote under a state statute. N.C. Gen. Stat. §163-258.2(1)(e). Voters targeted by the second category likewise had the right to vote (without providing photo identification) under North Carolina law, which provided that such voters were "not required to submit a photocopy of acceptable photo identification." 8 N.C. Admin. Code 17.0109(d); *see also* N.C. Gen. Stat. §§163-258.2, 163-258.17(b).

The NCSBE dismissed the Protests based largely on federal law. *See Griffin v. NCSBE*, No. 25-1018 at 1 (4th Cir. Feb. 4, 2025) (per curiam). But Griffin continued to press them, filing several appeals that were eventually removed to the Eastern District of North Carolina. *See id.* The district court remanded those appeals without retaining jurisdiction over the federal-law issues, but this Court reversed in part, ordering the district court to retain jurisdiction over Griffin's removed direct appeal until final resolution in state court (including any appeals) to ensure federal resolution of the "federal constitutional issues" at stake. *Id.* at 9. Griffin proceeded

3

against the NCSBE and Justice Riggs in state court, where the defendants reserved their right to a federal forum to adjudicate the federal issues. *See* D.E.28, *Griffin v. NCSBE*, No. 24CV040619-910 (Wake Cnty. Sup. Ct. Feb. 6, 2025).

The state proceedings in the Griffin cases have concluded: On April 11, the North Carolina Supreme Court denied review as to the overseas voters who had registered based on their parents' state residence (so-called "never residents"), leaving in place an earlier state court of appeals order directing the Board to identify and exclude their votes. *Griffin v. NCSBE*, 2025 WL 1090903, at *3 (N.C. Apr. 11, 2025). The state supreme court also largely denied review as to the second category (overseas voters who did not provide photo identification with their ballots), agreeing that their votes should be excluded absent cure but "expand[ing] the period to cure deficiencies" set by the state court of appeals "from fifteen business days to thirty calendar days after the mailing of notice." *Id.* The state supreme court did not specify whether its decision applied only to Guilford County or to the nearly 4,000 voters from other Democratic-leaning counties that Griffin added after the protest deadline. *Id.*

## B.  NCDP's Lawsuit

This appeal arises from a lawsuit that NCDP initiated in the Eastern District of North Carolina against the NCSBE and its members. *See* Dkt.5:24-cv-699, ECF 1. The operative complaint reflects the developments described above; as relevant

4

to this motion, it alleges that selectively discarding votes and subjecting voters to a cure process more than five months after voters cast their ballots in accordance with the guidance they received from the state violates the First and Fourteenth Amendments. *Id.*, ECF 35 (Second Amended Complaint).

After the North Carolina Supreme Court's April 11 ruling, NCDP sought a preliminary injunction and a temporary restraining order in this case, asking the district court to "temporarily restrain and preliminarily enjoin the NCSBE from carrying out any 'cure' process, discarding any votes, or … certifying the election for Judge Griffin, so that federal courts can determine whether doing so violates federal law before the irreparable harm is inflicted." *Id.*, ECF 37 at 9.

The same day, the court issued a minute order that it described as granting NCDP's motion in part, stating that "Defendants are ORDERED to proceed in accordance with" the state court opinions requiring NCSBE to begin discarding and/or curing votes "but SHALL NOT certify the results of the election, pending further order of this court." *Id.*, Text Order (Apr. 14, 2025). The court later described the motions it had partly denied as seeking "temporary restraining orders," Dkt.5:24-cv-731, ECF 60 at 2 & n.1, without mentioning that it had denied NCDP's preliminary injunction motion. The court also consolidated NCDP's lawsuit with Griffin's direct appeal from NCSBE's order denying his protests and with a lawsuit voters filed (Dkt.5:25-cv-193). Dkt.5:24-cv-699, Text Order (Apr. 14, 2025).

Parties in all three cases have filed their own separate appeals from the district court's order, and Justice Riggs, voter groups, and voters have moved for injunctions pending appeal. Dkts.25-1397, 25-1398, 25-1401.

## C. The NCSBE's Ongoing Process

As ordered by the district court, NCSBE filed a notice of its proposal for complying with the state supreme court opinion. Dkt.5:24-cv-731, ECF 61 (NCSBE Notice). According to that proposal—which Griffin is now challenging in state court, *see infra* p.7—NCSBE has interpreted the state courts' orders to apply only to ballots targeted by Griffin's timely protests (i.e., the nearly 300 ballots cast in reliance on parental residence and the approximately 1,400 ballots cast without photo identification in Guilford County). *Id.* at 2-3. The NCSBE explained that overseas and military voters who voted online would *not* have been able to submit photo identification "[b]ecause the online portal" through which many of those voters cast their ballots "is not currently configured to accept attachments." *Id.* at 3 n.3. And it pointed out errors in Griffin's protests: They listed certain names "several times," *id.* at 2 n.1, and named voters as "never residents" who have reportedly lived in North Carolina, *id.* at 4 n.6 (citing sources).

The NCSBE "intends to instruct" county boards to take certain steps to confirm that the protests do not name anyone in error. NCSBE Notice at 3-4. The NCSBE then intends to direct counties to notify voters that their votes may be

discarded if they do not take certain enumerated steps. *Id.* at 6-7. It does not address ballots cast by voters who have died since voting.

On April 16, Griffin sought mandamus from the North Carolina Court of Appeals, challenging NCSBE's plan as not compliant with the state-court decisions. *See* Dkt.5:24-cv-731, ECF 76-1. Because those proceedings are ongoing, the ultimate scope and terms of the post-election measures the state courts ordered remain uncertain.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331, and this Court has jurisdiction under 28 U.S.C. §1292(a)(1). The district court issued a text order on April 14 (Dkt.5:24-cv-699), denying in part NCDP's motion for a preliminary injunction and temporary restraining order. (The district court later claimed it denied only "temporary restraining orders," Dkt.5:24-cv-731, ECF 60 at 2 & n.1, but NCDP asked the court to "preliminarily enjoin the NCSBE from carrying out any 'cure' process" or "discarding any votes." Dkt.5:24-cv-699, ECF 37, at 9; *see also* Dkt.5:24-cv-731, ECF 40.)

## LEGAL STANDARD

Under Federal Rule of Appellate Procedure 8(a)(2), an injunction pending appeal should issue if (1) appellant is likely to succeed on appeal; (2) appellant will likely be irreparably injured absent an injunction; (3) the balance of equities favors

appellant; and (4) an injunction benefits the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (discussing stay pending appeal); *Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at *1 (4th Cir. Aug. 25, 2022) (*Nken* in granting injunction pending appeal); *Wise v. Circosta*, 978 F.3d 93, 111 (4th Cir. 2020).

## ARGUMENT

## I.  NCDP WILL LIKELY SUCCEED ON APPEAL

NCDP will likely prevail on its appeal of the district court's denial of a preliminary injunction.

### A.  NCDP Is Likely To Succeed On Its Equal-Protection Claim

The Fourteenth Amendment's Equal Protection Clause guarantees citizens "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  And "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105 (2000) (per curiam).

The selective application of new election rules violates this binding precedent. Voters that the Protests targeted are "at risk of being disenfranchised while similarly-situated voters are not, simply because of the county in which they reside … or their physical location."  *Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). This, along with subjecting only those arbitrarily targeted voters to the cure process

8

the state courts have ordered, punishes voters based on arbitrary distinctions, violating the Equal Protection Clause.

The Protests targeted only voters in certain counties (and only votes cast in Griffin's race). In particular, his challenge to military and overseas voters who submitted absentee ballots without accompanying photo ID was limited to ballots cast in heavily Democratic Guilford County. *See Griffin*, 2025 WL 1021724, at *40 (Hampson, J., dissenting). But there are military and overseas citizens in North Carolina's other 99 counties who also submitted absentee ballots without either a copy of a photo ID or an ID exception form. Unlike similarly situated voters from Guilford County (or Griffin's five untimely-added counties, if his mandamus petition succeeds), the votes of citizens in these other other counties will be unaffected even if they do not provide photo identification within 30 days. Discarding (or threatening to discard) votes of residents of one county, but not ballots with the same alleged defects cast by voters in a different county, is "arbitrary and disparate treatment" that impermissibly "value[s] one person's voter over that of another." *Bush*, 531 U.S. at 104-105.

The 30-day cure process confirms these equal-protection problems. Requiring early and absentee voters and voters from targeted counties to complete additional steps in order to have their votes counted—steps not required of any other voters in the 2024 North Carolina Supreme Court election or in any other race—

violates the Equal Protection Clause by subjecting similarly-situated voters to drastically different voting rules based on the losing candidate's strategic decision to target (and thus burden) only voters registered in counties more likely to vote for his opponent.

**B.     NCDP Is Likely To Succeed On Its Due Process Claims**

### 1.     Undue Burden

State laws that burden the right to vote violate the First and Fourteenth Amendments unless relevant and legitimate state interests of sufficient weight justify the burden. *Anderson v. Celebrezze*, 460 U.S. 780, 788-790 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The more severely a law burdens the right to vote, the more strictly it is scrutinized. *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014); *Burdick*, 504 U.S. at 434.

Changing election rules after voters relied in good faith on state law in place before and during the election unduly burdens the right to vote. For example, in a case this Court described as reflecting "settled" law (*Hendon v. North Carolina State Board of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)), the First Circuit held that a state's retroactive discarding of ballots cast by voters who "follow[ed] the instructions of the officials charged with running the election" amounted "to a fraud upon the absent voters," *Griffin v. Burns*, 570 F.2d 1065, 1074-1075 (1st Cir. 1978). *Hendon* also recognized the burdens inherent in post-election litigation, noting that

"[c]ourts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication" because "failure to require pre-election adjudication would permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." 710 F.2d at 182 (quotation marks omitted).

Other courts' caselaw is similar. As the First Circuit recognized in *Griffin v. Burns*, for instance, when a state reneges on its promise that voters' ballots will count, due process is violated because the right "involves the appearance of fairness as well as actual fairness." 570 F.2d at 1079. And in *Bennett v. Yoshina*, 140 F.3d 1218, 1226-1227 (9th Cir. 1998), the Ninth Circuit explained that a substantive-due-process violation occurs if there is "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures."

Those principles apply here. Undoing the election results with "a court action," *Hendon*, 710 F.2d at 182, is *exactly* what Griffin seeks. Likewise, declining to count registered voters' timely cast ballots due to an administrative "error" that was induced by the state—not including a photocopy of a photo ID with an overseas mail-in ballot—severely burdens the right to vote. So does not counting the vote of

11

an overseas voter who, under then-current state law, could vote based on her parents'
North Carolina residence. The state cannot change the rules *after* an election to deny
the fundamental right to vote to those who followed the rules in place before and
during the election.

That some voters may have a chance to prevent their votes from being
discarded does not alter the undue-burden analysis. Being subjected to such a
verification process five months after votes have been cast and counted is itself a
"severe burden on ballot access," warranting strict scrutiny, *Pisano*, 743 F.3d at 933,
particularly because this is no ordinary "cure" procedure (a term that suggests a voter
did something wrong). It is a demand that voters who were *told* that they were
eligible to vote and could cast their ballots in a particular way (i.e., from overseas
via a state-created system that did not allow for—let alone require—them to submit
identification) nonetheless prove their identity to the state in order for their votes in
one particular election to *actually* be counted.

Supreme Court cases cautioning federal courts against altering state election
laws shortly before an election confirm the undue burden that would be imposed by
changing rules now—including by subjecting voters to a cure process. "Court orders
affecting elections, especially conflicting orders, can themselves result in voter
confusion and consequent incentive to remain away from the polls. As an election
draws closer, that risk will increase. *Purcell v. Gonzales*, 549 U.S. 1, 4-5 (2006)

12

(per curiam). This *Purcell* principle "reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S.Ct. 879, 880-881 (2022) (Kavanaugh, J., concurring in grant of stay applications). Here, the rules are being changed more than five months *after* the election, far later than *Purcell* would kick in to prevent eve-of-election changes.

No sufficiently weighty state interest justifies changing the rules that govern the election after voters have cast their votes, whether those changes result in the wholesale discarding of votes or requiring voters to provide identification. North Carolina has no interest in—and has a strong interest against—inflicting the significant harm that would flow from retroactively disenfranchising voters who registered and voted in reliance on its own instructions. As one voter stated, for example, "[i]f my ballot is retroactively discarded under Judge Griffin's protest, I will feel stripped of my citizenship and completely betrayed." Dkt.5:24-cv-699, ECF 37-10, at 2.

Common sense and basic fairness confirm that conclusion. Indeed, the North Carolina Supreme Court itself explained that under its "longstanding precedent, mistakes made by negligent election officials … 'will not deprive [citizens] of [their]

13

right to vote or render [their] vote[s] void after [they have] been cast.'" *Griffin*, 2025 WL 1090903, at *2 (quotation marks omitted) (alterations in original).

Absent a preliminary injunction, the state will unduly burden the voting rights of NCDP members, in violation of the First and Fourteenth Amendments.

### 2.    *Procedural Due Process*

Even if it were ever permissible to retroactively change the rules after an election in order to discard ballots, it is not permissible here because the affected voters will not have been provided adequate process.

A procedural-due-process violation exists where state action deprives someone of "a cognizable liberty or property interest"—here, the undeniable interest in exercising one's constitutionally protected right to cast a ballot that will be counted, *see Harper*, 383 U.S. at 667—and "the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011) (quotation marks omitted). To assess the adequacy of procedural protections, courts examine (1) "the private interest that will be affected"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Applying those

factors confirms that the relief ordered by the state courts violates procedural due process—and thus the district court erred by not granting a preliminary injunction.[2]

*First*, the private interest at stake is extremely strong. "No right is more precious in a free country than that of having a voice in the election of those who make the laws." *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). The action ordered by the state courts threatens that right, which encompasses voters' right both to "cast their ballots" *and* to "have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941).

*Second*, there is a serious risk of erroneous deprivations of the right to vote. Griffin has not claimed that even one of the overseas voters who did not provide photo ID is not who the voter claimed to be. *See* N.C. Gen. Stat. §163-166.16(g) (explaining this to be the purpose of photo identification). While the NCSBE's "intended" approach (as described in the district court) could alleviate some risk of error, Griffin's challenge to that approach remains pending in state court, *supra* p.7, so the ultimate terms of the remedial process remain unclear. Thus, absent federal intervention, eligible voters may lose their right to cast a vote that will be counted unless all the stars happen to align.

---

[2] "Multiple district courts" have applied *Mathews* to "procedural due process challenges to election regulations." *Arizona Democratic Party v. Hobbs*, 485 F.Supp.3d 1073, 1093 (D. Ariz. 2020) (collecting cases), *vacated on other grounds*, 18 F.4th 1179 (9th Cir. Dec. 8, 2021).

In particular, under the Board's current plan, such voters must (1) actually receive a mailing the Board sends them, which will require not only that the Board have the correct mailing information but also that the voter not be indisposed during the narrow cure period; (2) have on hand the necessary proof of eligibility the Board is demanding (or be able to procure it very quickly); (3) be in a position to photocopy that information or fill out an exception form; and (4) be able to successfully return that information to the Board—all in just 30 days. *See* Lawson Decl. ¶21. That will be difficult or impossible for many voters, including those who have died, moved, cannot be contacted, or cannot access a computer or postal services. *Id.* ¶¶20-21. And even if all necessary steps happen, the lack of any way to appeal a determination that the information submitted does not suffice to "cure" further heightens the risk of erroneous determinations.

That risk is even higher for the hundreds of voters who are not guaranteed, under the state courts' orders, to be sent *any* notice from the state before their ballots are discarded, i.e., those labeled by Griffin as "never residents," *Griffin*, 2025 WL 1021724, at *15. Although the Board has announced plans to determine whether any voters were placed on the list in error (as has been reported), *see* NCSBE Notice at 4 n.6, that is not guaranteed, especially in light of Griffin's pending mandamus petition. And binding precedent establishes that procedures are typically inadequate

16

where "notice and an opportunity to be heard" are not guaranteed, *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 323 (4th Cir. 2009).

*Third*, the state has no valid interest either in disenfranchising eligible voters or in unfairly changing the rules after an election in order to do so. And requiring additional or substitute process would not unreasonably burden the state, because state law already establishes a system for providing notice and an opportunity to be heard: North Carolina's ordinary challenge and protest processes guarantee voters *meaningful* notice and an individualized hearing at which a voter whose eligibility or identification is challenged has an opportunity to attest that she is qualified to vote or to cast a valid vote *before* her ballot is counted. *See* N.C. Gen. Stat. §§163-85 to 163-88. There is no reason such a process could not have worked here, and voters should not have to undergo a constitutionally inadequate process because Griffin failed to challenge these voters before the results were canvassed. Alternatively, the individualized process available pre-election could be used post-election. While that may be costly, the costs cannot be viewed as overly burdensome, since state law provides for such hearings pre-election. Regardless, costs cannot control the analysis; surely if, for example, Republican candidates protested every Democratic voter's ballot, the strong interest in avoiding a partisan voter purge would justify additional processes. Likewise, that individualized hearings may extend the process

is not dispositive.  The scale of the threatened disenfranchisement heightens the need for more process, even if the costs—in money and time—would be significant.

Balancing these three factors makes clear that the so-called remedial process is inadequate:  A crucial right is at stake; the chances of erroneous denial of that right is high, and the burden on the state for a process that would reduce those chances is minimal and in any event warrants relatively little weight in the analysis.  The balance thus tips sharply in favor of a due-process violation.

## II.  THE REMAINING FACTORS FAVOR AN INJUNCTION

Given NCDP's likelihood of success, an injunction would be warranted even if the other factors did not support one.  But each one does.

### A.    NCDP Will Be Irreparably Harmed Without An Injunction

Commencing the unlawful cure process, which threatens to culminate in the discarding of votes, will irreparably harm NCDP.

"Courts routinely deem restrictions on fundamental voting rights irreparable injury."  *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases).  The district court has blessed such restrictions here.  It effectively adopted the North Carolina Supreme Court order, which directs the NCSBE to identify and discard ballots in the first category of Protests.  Even according to the NCSBE's current proposal, those voters can prevent removal of their ballots from the vote count only if they can timely receive,

18

complete, and submit an affidavit attesting they were improperly named (unless a county board independently reviews historical records to determine that they were listed in error). *See* NCSBE Notice at 5. And, absent federal action, other military and overseas voters will have their votes identified for removal from the count unless they can provide photo identification within 30 calendar days from the date the notice is mailed (or, again, unless their county independently determines that they were listed in error). *Id.* at 4-7. Many of these voters reside overseas and may have moved in the seven months since absentee ballots were sent to them. Lawson Decl. ¶14. At least one such military voter has tragically died since she voted. *Id.* ¶20.

Forcing these selectively targeted (predominantly Democratic) voters to defend their votes several months after the election or have their votes discarded, irreparably harms NCDP—a membership organization which aims to elect Democrats in North Carolina by supporting candidates and ensuring that all voters can cast ballots and have their votes counted. Second Amended Complaint ¶¶22-23; Lawson Decl. ¶2. That is not only because NCDP represents many of the targeted voters, but also because it must now devote limited time and resources to contact them and convince them to participate. Lawson Decl. ¶¶14, 20-21, 28. Such irretrievable loss constitutes irreparable harm, *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 361 (4th Cir. 1991). That harm is especially pronounced because the voters reside abroad and/or at bases where NCDP cannot go door to door

or easily phone bank, such that NCDP must engage in non-traditional methods of research and outreach.  Lawson Decl. ¶21.  And the burden to participate in this unlawful cure process falls disproportionately on NCDP and its voters, given the strategic targeting of Democratic-leaning counties.  *Id.* ¶¶22-23, 25-26.  The injury may be even greater for the "never residents," because the state courts have not mandated any notice or cure process as to those voters—and Griffin has petitioned for a state-court writ of mandamus to prevent the Board from providing them any such notice or opportunity (as the Board otherwise proposes to do).

### B. The Equities And Public Interest Favor An Injunction

The balance of equities and public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  They favor an injunction here.

Granting an injunction would halt an unlawful cure process and prevent burdening selectively-targeted North Carolina voters, including military servicemembers and their families.  The public has a "strong interest in exercising the fundamental political right to vote," *Purcell*, 549 U.S. at 4 (quotation marks omitted)—which includes the right to have one's vote counted, *see Reynolds*, 377 U.S. at 554.  That interest is best served by "permitting as many qualified voters to vote as possible" (and, again, to have their votes counted).  *Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).  Indeed, "electoral integrity is enhanced, not diminished, when all eligible voters are allowed to exercise their right to vote

20

free from interference and burden unnecessarily imposed by others." *North Carolina State Conference of NAACP v. Cooper*, 430 F.Supp.3d 15, 53 (M.D.N.C. 2019). Conversely, subjecting voters to an unlawful cure process months after the election and threatening to discard votes cast in reliance on state instructions undermines the public's interest in election integrity and stability.

That conclusion is borne out by the public alarm over Griffin's and the state courts' actions. Scores of public interest groups, including at least one representing veterans and overseas American citizen families, have expressed the toll that this retroactive disenfranchisement would impose on overseas voters and on public trust in elections. *E.g.*, Brief of Secure Families Initiative and Certain Members of Count Every Hero, *Griffin*, No. 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 3, 2025), https://tinyurl.com/4f8798pd. And a bipartisan group of over 200 North Carolina jurists—including former state supreme court justices—and senior state government officials and lawyers issued a letter describing the Protests as "a threat to the public's faith in" state government and urging Griffin to abandon his attempt to thwart the will of the people. *See* Letter to Judge Jefferson Griffin (Mar. 18, 2025), https://tinyurl.com/4xpk7ar7. Others have emphasized that overturning the election result by changing the rules after the fact would embolden other candidates to adopt Griffin's playbook, setting a dangerous precedent and imperiling the peaceful transition of power. *See, e.g.*, Holder, *The Courts Must Stop This Judge From*

*Stealing an Election*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/3n82vvz8.

Preventing such a regime is assuredly in the public interest.

## CONCLUSION

The Court should enjoin the NCSBE from sending notices that trigger the 30-day cure window or discarding any votes pending resolution of this appeal.


April 17, 2025                          Respectfully submitted,

                                        /s/ Seth P. Waxman

SHANA L. FULTON                         SETH P. WAXMAN
WILLIAM A. ROBERTSON                    DANIEL S. VOLCHOK
JAMES W. WHALEN                         CHRISTOPHER E. BABBITT
BROOKS, PIERCE, MCLENDON                JANE E. KESSNER
   HUMPHREY & LEONARD, LLP              NITISHA BARONIA
150 Fayetteville Street, Suite 1700     ANN E. HIMES
Raleigh, N.C. 27601                     WILMER CUTLER PICKERING
(919) 839-0300                             HALE AND DORR LLP
                                        2100 Pennsylvania Avenue N.W.
                                        Washington, D.C. 20037
                                        (202) 663-6000
                                        seth.waxman@wilmerhale.com

**CERTIFICATE OF COMPLIANCE**

The foregoing complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word for Microsoft 365), the foregoing contains 5,102 words, excluding the portions exempted by Rule 32(f).

/s/ Seth P. Waxman
SETH P. WAXMAN

**CERTIFICATE OF SERVICE**

On this 17 day of April, 2025, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by that system.

/s/ Seth P. Waxman
SETH P. WAXMAN